IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 15, 2003

## STATE OF TENNESSEE v. MICHAEL LYNN HORN

**Direct Appeal from the Circuit Court for Putnam County**
**No. 00-0492     Leon C. Burns, Jr., Judge**

---

**No. M2002-00903-CCA-R3-CD - Filed July 17, 2003**

---

The Putnam County Grand Jury indicted the Defendant for theft and possession of a weapon by a convicted felon.  The trial court severed the counts, and a jury convicted the Defendant on the weapon charge.  The trial court sentenced the Defendant to four years incarceration, to be served consecutively to an unrelated sentence.  The Defendant now appeals, arguing the following: (1) that insufficient evidence was presented at trial to support his conviction, (2) that the trial court erred by failing to instruct the jury on the lesser-included offense of attempted possession of a weapon by a convicted felon, and (3) that the trial court improperly sentenced the Defendant, both in length and by requiring the sentence to be served consecutively to the unrelated sentence.  Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

H. Marshall Judd, Assistant Public Defender, Cookeville, Tennessee, for the appellant, Michael Lynn Horn.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; William E. Gibson, District Attorney General; Terry D. Dycus and Anthony Craighead, Assistant Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I. FACTS

Deputy Steve Flowers testified that on February 17, 2000, at approximately 11:00 a.m., he and several other deputies went to the home of the Defendant's mother looking for the Defendant.  Flowers stated that when they knocked on the door, they heard someone running toward the back of the trailer.  He testified that when the Defendant's brother, Alex Horn, answered the door, the

officers asked where they could find the Defendant. When Horn replied that the Defendant was "[b]ack that way," Flowers and four other officers proceeded to the back bedroom of the trailer.

Flowers testified that they found the Defendant kneeled down beside the bed in the back bedroom of the trailer. According to Flowers's testimony and a diagram entered into evidence at trial, the officers entered the room facing the foot of the bed. Flowers reported that the officers found the Defendant in a space three to four feet wide between the bed and the back wall. At that point, Flowers "picked [the defendant] up, put him on the bed and handcuffed him." Flowers further stated that when he picked up the Defendant, he found a gun underneath him between his knees. Flowers testified that the gun had a brown handle, that it had a clip in it, and that it was in a black holster. Flowers noted that the holster's snap was fastened, securing the gun in place in the holster. He conceded that at no time did he see the Defendant with the gun in his hand. Flowers testified that after handcuffing the Defendant, he picked up the gun and handed it to Deputy Fields, who then took it outside and gave it to Detective Gary Roach. Flowers reported that the total time from the officers knocking on the trailer door to finding the Defendant in the bedroom was less than a minute. He did not make an arrest report at the time of the arrest, nor did he personally make a determination of who owned the gun or who had purchased it.

On cross-examination, Flowers stated that he did not see anyone remove the mattress from the bed near where the Defendant was found, and he repeated that he found the gun under the Defendant and not under the bed. When asked by the State to mark on a diagram of the bedroom where he found the Defendant, Flowers marked the area between the bed and the wall. When asked where on the diagram he found the gun, he stated that he would put that mark in the same place as the previous one, as the gun was underneath the Defendant.

Bob Krofssik, a special agent with the Tennessee Bureau of Investigation, interviewed the Defendant in jail after the Defendant's arrest. Krofssik testified that he read the Defendant his Miranda rights prior to questioning him, and the Defendant signed a form waiving these rights. Krofssik testified that the Defendant "seemed to be able to understand what [his] questions were, where he was at, and he seemed to understand what his rights were." The Defendant then gave a written statement regarding the events of the prior evening and early morning leading up to his arrest. Within this, he stated, "When the police picked me up this morning I wanted them to kill me. I let them know I had a gun. I didn't want to shoot myself. I'm tired of all the drugs. If I had to do it over again, they would have had to shoot me. The gun I had was my brother's."

The day after the Defendant's arrest, Agent Krofssik questioned him a second time regarding the gun, again reading the Defendant his Miranda rights and getting a waiver first. That conversation was audio tape recorded, and the tape was entered into evidence at trial. During the taped conversation, in response to a question regarding whether he had a gun when he was arrested, the Defendant responded, "Oh, yeah, yeah, I had a gun. What's the big deal? That ain't nothing." Agent Krofssik replied, "Well, it could be a big deal, couldn't it?" The Defendant responded, "Well, no, I don't see that it was. The only reason I had that gun was for the Sheriff's Department to do

their job." Although during this second interview the Defendant complained of a stomach ache, Krofssik testified that it did not impair his ability to communicate about the gun.

On cross-examination, Krofssik testified that at the time of his first interview with the Defendant, he did not know if the Defendant was intoxicated other than what the Defendant told him. However, he acknowledged that the Defendant "was in rough shape" and indicated that he wrote on the Miranda form that the Defendant claimed to have used drugs between 1:00 and 1:30 a.m. on the morning of his arrest.

Prior to concluding the presentation of the State's evidence, counsel for the State presented to the court a stipulation by the Defendant and his attorney that the Defendant had a "prior felony conviction involving the use or attempted use of force or violence that would qualify under the statute of being a convicted felon unable to possess a weapon."

Alex Horn, the Defendant's brother, testified that on the day of the Defendant's arrest, he was watching television, and the Defendant was asleep in a recliner in their mother's trailer when the police knocked on the door looking for the Defendant. Horn reported that he told his brother that "the law was there and [the Defendant] jumped up and run to the back bedroom." Horn stated that he then complied with the officers' request for him to step outside. Horn observed the officers bring out the Defendant along with the gun. He stated that the gun was not in a holster at that time, and that when he asked "what they was doing with a gun," the officers told him that they found it with the Defendant. Horn testified that the gun belonged to him. He stated that he had owned the gun for a little over a week, but he had not seen it in three or four days. At trial, Horn identified the gun recovered during the Defendant's arrest as being the same gun he had purchased the week before. He claimed that he put the gun in a sock drawer in the bedroom, and that it had not been loaded at that time. However, he later conceded that he would not dispute Agent Krofssik's statement that he had previously stated that the gun was loaded at the time of purchase and that he never took the shells out of it. He indicated that he only found out later that his mother had moved the gun to underneath her bed. He testified that prior to the Defendant's arrest, he had never seen the Defendant with the gun. He maintained that the only way the Defendant would have the gun was if he had taken it without Horn's knowledge. Horn testified that earlier during the week of the Defendant's arrest, the Defendant said that he needed a gun because "he wasn't going to be taken by the law," though Horn disputed that he made any statements regarding the Defendant's possession of or need for the gun on the day of his arrest.

Barbara Smith, the mother of the Defendant and Alex Horn, testified that she found Horn's gun in a drawer in his room and that she moved it to underneath her full-size bed, not far from the foot. However, she stated that "you'd have to get down on your knees and reach under there" to get to the gun. Smith was not present at the time of the Defendant's arrest. However, she testified that she never told him about the gun, nor had she even told Horn, its owner, that she had moved it. She stated that she did not know whether the gun was loaded or whether the safety was on when she moved it, but she did not load or unload it herself. Finally, she stated that when she returned to her

home on the day of the Defendant's arrest, her bed "was tore all to pieces," the mattresses had been removed, and she had to put screws back into the frame.

Bob Krofssik, when called to testify a second time as a rebuttal witness, stated that he had spoken to Alex Horn regarding the particular gun found under the Defendant at the time of his arrest. He testified that in an interview with Horn on the day of the arrest, he asked Horn, "Did [the Defendant] ever tell you that the reason that he was carrying the gun that he had on him that night or any time [was] that he wasn't going to be taken by the law?" He testified that Horn responded, "That's what he said. He said he didn't want to go back to jail. That's exactly what he said. And I told him that he was, how dumb he was."

## II. ANALYSIS

### A. Sufficiency of Evidence

The Defendant argues that the trial court erred by failing to find as a matter of law that the evidence was insufficient to sustain his conviction of possession of a weapon by a convicted felon. See Tenn. Code Ann. § 39-17-1307(b)(1). He alleges that there is no evidence in the record that he physically or constructively possessed a gun. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Sufficient evidence was presented in this case for a rational jury to convict the Defendant of possession of a weapon by a convicted felon. "A person commits an offense who possesses a handgun and . . . [h]as been convicted of a felony involving the use or attempted use of force, violence or a deadly weapon." Tenn. Code Ann. § 39-17-1307(b)(1). Defense counsel stipulated

that the Defendant had a prior felony conviction involving the use or attempted use of force or violence that would bring him within the scope of the statute. The only evidentiary issue, therefore, is whether there was sufficient evidence to support the finding that the Defendant possessed a handgun at the time of his arrest.

The evidence in this case was overwhelmingly sufficient to prove that the Defendant had possession of a gun at the time of his arrest. "Possession may be actual or constructive." State v. Williams, 623 S.W.2d 121, 125 (1981). Constructive possession occurs when a person knowingly has "'the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" Id. (quoting United States v. Craig, 522 F.2d 29 (6th Cir. 1975)).

When the police arrived at the residence of the Defendant's mother, the Defendant ran to the back bedroom of the trailer. After gaining entrance to the trailer, the officers found the Defendant in the back bedroom kneeling on the floor between the bed and the wall. Flowers testified that when he picked up the Defendant to handcuff him, he found a gun underneath him between his knees. He emphasized his certainty that the gun was between the Defendant's knees and not under the bed. We conclude that a rational jury could have found that from the Defendant's positioning, he had the ability, power, and intention to exercise dominion and control over the gun, and thus, he had constructive control over it.

Furthermore, the Defendant stated during questioning on the day of his arrest, "I let them know I had a gun. . . . The gun I had was my brother's." The next day, during a separate interrogation, he stated, "Oh, yeah, yeah I had a gun. What's the big deal? That ain't nothing." He also stated, "The only reason I had that gun was for the Sheriff's Department to do their job." There was also testimony from the Defendant's brother that sometime in the week prior to the Defendant's arrest, the Defendant had claimed that his reason for carrying a gun was that "he wasn't going to be taken by the law." Given the officers' testimony as to the location of the gun and the Defendant's own self-incriminating statements, we conclude that there was ample evidence to support the jury's finding that the Defendant possessed the gun.

### B. Lesser-Included Offense Instruction

The Defendant argues that the trial court erred by failing to instruct the jury on the lesser-included offense of attempted possession of a weapon by a convicted felon. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

When an issue is raised regarding the trial court's failure to instruct on a lesser-included offense, we must determine: (1) whether the offense is a lesser-included offense under the test adopted in State v. Burns, 6 S.W.3d 453 (Tenn. 1999); (2) whether the evidence supports an

instruction on the lesser-included offense; and (3) whether the failure to instruct on the lesser-included offense constitutes harmless error. State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002).

### 1. Classification as a Lesser-Included Offense

Regarding the first prong of our inquiry, criminal attempt by a convicted felon to possess a weapon is a lesser-included offense of the offense charged. Under the test adopted in Burns, an offense is a lesser-included offense if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67. As the State concedes, a charge for criminal attempt in this context properly falls under part (c) of the Burns test, making it a lesser-included offense of possession of a weapon by a convicted felon.

### 2. Evidence Supporting an Instruction on the Lesser-Included Offense

We conclude that the evidence in this case did not support an instruction on the lesser-included offense of criminal attempt. This part of the inquiry involves a two-step analysis: first, a trial court must determine whether any evidence exists that reasonable minds could accept in support of the lesser-included offense, and second, the trial court must determine if the evidence, viewed in the light most favorable to the existence of the lesser-included offense, is legally sufficient to support a conviction for the lesser-included offense. Allen, 69 S.W.3d at 187. It is the evidence, and not the theory of the parties, to which we look to determine whether an instruction on a lesser-included offense was warranted. Id. at 188. "In sum, when a reviewing court determines whether a lesser-included offense ought to be charged, the evidence clearly controls. If there is evidence sufficient to support a conviction for a lesser-included offense, we hold that a trial court must charge that offense." State v. Richmond, 90 S.W.3d 648, 662 (Tenn. 2002).

Regarding step one of the inquiry, we conclude that evidence did not exist that reasonable minds could have accepted in support of attempt. "As a general rule, evidence sufficient to warrant an instruction on the greater offense also will support an instruction on a lesser offense under part

(a) of the Burns test.  In proving the greater offense the State necessarily has proven the lesser offense because all of the statutory elements of the lesser offense are included in the greater." Allen, 69 S.W.3d at 188.  However, "[t]he general rule for lesser offenses under part (a) of the Burns test does not extend to lesser offenses under part (c) of the test.  Part (c) of the test expressly designates facilitation, attempt, and solicitation as lesser offenses.  For lesser offenses under part (c), proof of the greater offense will not necessarily prove the lesser offense." Id.

Attempt to unlawfully possess a weapon falls squarely under (c)(2) of Burns.  Proof of the charged offense requires the State to prove (1) that the Defendant possessed a handgun, and (2) that he had been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon.  Tenn. Code Ann. § 39-17-1307(b)(1).  In contrast, proof of the lesser-included offense of attempt by a convicted felon to possess a weapon would require the State to prove that (1) the Defendant intended to complete a course of action or cause a result that would constitute possession of a weapon, under the circumstances surrounding the conduct as the Defendant believed them to be, (2) such conduct constituted a substantial step toward commission of the offense, and (3) the Defendant had been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon.  Tenn. Code Ann. § 39-12-101(a)(3); id. § 39-17-1307(b)(1).  Therefore, attempt requires an intent to possess and a substantial step without completion, whereas actual possession has no such requirements.  Because of these additional proof requirements, attempt cannot be categorized in the Burns (a) category, which would otherwise mandate a finding of evidence sufficient to support an instruction on attempt.

An additional jury instruction was also unwarranted on the grounds that the facts of this case did not involve an attempt.  "An 'attempt' necessarily means that the offense was not completed." State v. Grainger, No. M2001-02178-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 927, at * 13 (Tenn. Crim. App., Nashville, July 16, 2002) (citing Levasseur v. State, 464 S.W.2d 315, 319 (Tenn. Crim. App. 1970)).  Here, reasonable minds could not have found that there was an incomplete endeavor or substantial step.  The Defendant completed the act of possession, whether constructive or actual; he did not try and fall short, but rather succeeded.  The gun was found between his knees, with him kneeling over it.  He had immediate access to it and the ability to bring it within his control. The trial evidence established and the jury found that the Defendant completed the act of possession of a handgun, be it constructive or actual possession.  Such a finding, in this case supported by a great weight of the evidence, precludes an inconsistent finding of an incompleted act, and therefore precludes a conviction of attempt.

### 3. Harmless Error

Even if the evidence in this case had been sufficient to warrant a jury instruction for the lesser-included offense of attempt to possess a weapon by a convicted felon, the omission of such an instruction constituted harmless error.  "When a lesser-included offense instruction is improperly omitted, . . . the harmless error inquiry is the same as for other constitutional errors: whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." Allen, 69 S.W.3d at 191.  In making this determination, a reviewing court should conduct a thorough

examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Id. "[A] court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is 'no,' holding the error harmless does not 'reflect a denigration of the constitutional rights involved.'" Neder v. United States, 527 U.S. 1, 19 (1999) (citing Rose v. Clark, 478 U.S. 570, 577 (1986)).

Here, in finding the Defendant guilty, the jury necessarily found that he had completed the act of possessing the gun. Further, defense's theory at trial was that the Defendant had nothing to do with the gun; he had no intent to possess it or exercise control over it. The defense contends that the gun had been placed under the bed by the Defendant's mother, and was simply found there by coincidence when the police arrested the Defendant. Given such a theory and the jury's contrary finding of possession, a charge on attempt would have been unwarranted and would have made little sense. Intent is required for attempt, and at trial, the Defendant contended that there was no intent. Further, the factual finding of the completed act of possession precludes an inconsistent finding of the incompleted act of attempt. We therefore decline to disturb the trial court's judgment on this ground.

### III. Sentencing

### 1. Length of Sentence

The Defendant next argues that the trial court erred in imposing the maximum possible sentence, which in this case was four years incarceration. See Tenn. Code Ann. § 40-35-112(b)(5). When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

"The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present." Tenn. Code Ann. § 40-35-210(c). "If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors." Id. § 40-35-210(e). "Should there be enhancement but no mitigating factors, then the court may set the sentence above the minimum in that range but still within the range." Id. § 40-35-210(d). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

Enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114.

> The obvious purpose of these limitations is to exclude enhancement factors which are not relevant to the offense and those based on facts which are used to prove the offense. Facts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment. The legislature, in determining the ranges of punishment within the classifications of offenses, necessarily took into account the culpability inherent in each offense.

State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

From our review of the record, we have concluded that the sentence in this case was entirely appropriate. The Defendant was classified as a Range II offender and convicted of a Class E felony, which placed him within the statutory sentencing range of two to four years incarceration. See Tenn. Code Ann. § 40-35-112(b)(5). In setting the Defendant's four-year sentence, the trial court found

three enhancement factors and no mitigating factors. The trial court applied the following enhancement factors: (1) that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," Tenn. Code Ann. § 40-35-114(1)[1]; (2) that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high," id. § 40-35-114(10); and (3) that the felony was committed while the defendant was on probation. id. § 40-35-114(13). The court stated that based on the facts of this case, the enhancement factor that the Defendant committed the offense when the risk to human life was high should be afforded less weight. However, the court determined that the balance of the factors justified imposing the maximum possible sentence.

The first enhancement factor is supported by the Defendant's numerous prior convictions. At the time of his arrest, the Defendant had over a dozen convictions spanning fourteen years, including three felony convictions. Even excluding from consideration the felonies used to place the Defendant within Range II, there were still ample prior convictions to support the application of the first enhancement factor. The second enhancement factor, commission of the offense while on probation, is undisputed. The final factor, commission of the offense when risk to human life was high, was also supported by sufficient evidence in the record, though given limited weight by the court. In the Defendant's written statement, he said, "When the police picked me up this morning I wanted them to kill me. I let them know I had a gun. I didn't want to shoot myself. I'm tired of all the drugs. If I had to do it over again, they would have had to shoot me." Such statements indicate that not only was there a high risk to human life, but that the Defendant probably even intended such a result. The evidence indicates that five law enforcement officers were present when the Defendant was apprehended in possession of a loaded pistol and was physically restrained by Officer Flowers. Further, according to Agent Krofssik, Alex Horn stated that the Defendant told him that "[h]e wasn't going to be taken by the law." The sum of this evidence demonstrates that "the defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(10). Given the appropriate findings of fact and application of enhancement factors to the length of the Defendant's sentence, the court will not disturb the sentence on appeal.

## 2. Consecutive Sentencing

The Defendant also argues that the trial court erred by ordering his sentence to run consecutive to his prior sentences. It is within the sound discretion of the trial court whether or not an offender should be sentenced consecutively or concurrently. State v. James, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A court may order multiple sentences to run consecutively if it finds by a preponderance of the evidence that the Defendant fits in one of the categories established by statute, including the following circumstances: "(2) The defendant is an offender whose record of criminal activity is extensive; . . . [and] (6) The defendant is sentenced for an offense committed

---

[1] At the time of the sentencing hearing, there were twenty-two statutory enhancement factors listed in Tennessee Code Annotated section 40-35-114. Subsequently, in Public Acts 2002, ch. 849, § 2, the legislature added a twenty-third enhancement factor, but listed it as enhancement factor (1) and renumbered previous factors (1) through (22) as (2) through (23). See Tenn. Code Ann. § 40-35-114 (Supp. 2002). In this opinion, we will refer to the enhancement factors of Tennessee Code Annotated section 40-35-114 as they existed at the time of the sentencing hearing.

while on probation . . . ." Tenn. Code Ann. § 40-35-115(b).  Further, when imposing consecutive sentences for an offender found by the court to be dangerous, the court must also determine that consecutive sentences are reasonably related to the severity of the offenses committed and that consecutive sentences are necessary to protect the public from further criminal conduct by the defendant.  State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

At the sentencing hearing, the judge found that the Defendant's record of criminal activity was extensive, and also highlighted the fact that the Defendant was in fact on probation at the time of the offense in this case, which places him squarely within the reach of the statute.  However, despite the involvement of a gun in the offense, the court made the finding that the Defendant was not to be classified a dangerous offender.  This finding rendered unnecessary the Wilkerson tests of reasonable relation to offense severity and necessity for public protection.  State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).  Therefore, the Defendant's prior record and arrest while on probation put the issue of consecutive sentencing within the trial judge's discretion, and as there is no evidence of abuse of discretion, that determination will not be disturbed on appeal.

Accordingly, we AFFIRM the judgment of the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE